# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF INDIANA
# HAMMOND DIVISION

| | |
|---|---|
| ELOUISE ANDERSON-WILSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     2:07-CV-239 PPS |
| | ) |
| SELECT SPECIALTY HOSPITAL | ) |
| NORTHWEST INDIANA, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Select Specialty Hospital fired Elouise Anderson-Wilson after a patient she was supposed to be caring for nearly died while Anderson-Wilson was on a break. Anderson-Wilson claims she was terminated by Select because of her race. But because Anderson-Wilson has not demonstrated that Select treated similarly situated employees outside of her protected class more favorably nor shown that the Select's reason for termination was pretextual, the lawsuit must come to an end. So Select's Motion for Summary Judgment [DE 39] is granted**.**

## BACKGROUND

Anderson-Wilson worked for Select Hospital since April 30, 2003 as a Respiratory Therapist ("RT"). (Anderson-Wilson Dep. [DE 41-2], at 36). She was responsible for providing intensive respiratory treatment and patient transport for respiratory patients at the hospital. (*Id*. at 39; RT Job Description [DE 41-3]). On the morning of October 13, 2006, Anderson-Wilson was assigned to a respiratory patient and ordered to wean him off a ventilator. (Anderson-Wilson Dep. [DE 41-2], at 145). The ventilator weaning process requires an RT to gradually decrease the patient's oxygen and ventilator rates until a patient is able to breathe independently. (*Id*. at 97-98). A trachea collar, or "T-piece," is used as an interim step between ventilated and

independent breathing.  (*Id*. at 99-101).  The period when a patient is introduced to a T-piece is one of high risk.  (*Id*. at 101-102).

On this particular morning, Anderson-Wilson removed her patient from his ventilator and inserted the T-piece between 7:00 a.m. and 8:00 a.m. (*Id*. at 145; English Job Performance Report [DE 41-4], at 1).  Shonita Pate, the nurse assigned to the patient that morning, wrote on her nurse's progress log that she called Anderson-Wilson into the patient's room and alerted her that the patient was complaining about shortness of breath and that he was "not tolerating." (Pate Dep. [DE 41-5], at 15; Nurses Progress Notes [DE 43]).  At 8:10 a.m., the notes indicate the patient was unstable and that Pate called Anderson-Wilson into the room. (Pate Dep. [DE 41-5], at 17;  Nurses Progress Notes [DE 43]).  Contrary to the notes, Anderson-Wilson claims that she was already in the room and remained with the patient until after 8:00 a.m., at which time the patient was stable and tolerating the T-piece. (Anderson-Wilson Dep. [DE 41-2], at 145-148).

Sometime before 10:10 a.m., Anderson-Wilson went on a lunch break.  (*Id*. at 148-150; Anderson-Wilson 10/17/06 Handwritten Report [DE 41-4]; English Job Performance Report [DE 41-4], at 1).  She informed a fellow RT, Jeremy Metz, that she was leaving and that her patient was on a T-piece.  (Anderson-Wilson Dep. [DE 41-2], at 148-150).  At 10:10 a.m., while Anderson-Wilson was still on break, a doctor ordered the patient back on the ventilator. (English Job Performance Report [DE 41-4], at 1-2; Physician's Orders [DE 43]).  Shortly afterwards, Pate asked Metz to take a reading of the patient's respiratory signs.  (Metz Handwritten Statement [DE 41-4]).  Upon seeing the rate was elevated, he left the patient to find and inform Anderson-Wilson about his status.  Anderson-Wilson testified that Metz found her while on break and told her the patient "is in distress."  (Anderson-Wilson Dep. [DE 41-2], at 150-151).  They returned to discover the patient "in full-blown distress" with a heart rate well below normal.  (*Id*. at 151).  Anderson-Wilson, Metz, and Pate called a code blue, designated for

2

respiratory distress, and performed manual external breathing until the patient was returned to stable condition. (*Id*. at 151-153). They then placed him back on the ventilator. (*Id*.)

Anderson-Wilson's supervisor, Monica English, conducted an investigation into the incident. She interviewed Anderson-Wilson, Metz, Pate, and reviewed the medical file before completing a formal report. (Dyer Aff. [DE 41-6], ¶ 6.) English concluded that Anderson-Wilson had violated Select's code of conduct and that her actions placed a patient's safety in serious jeopardy. (English Job Performance Report [DE 41-4], at 1-2). She stated that taking lunch close to 10:00 a.m. is "very uncommon," that Anderson-Wilson had failed to follow a physician's order in a timely manner, that she failed to make regular rounds on ventilator patients, and failed to monitor those patients appropriately when placed on a T-piece. (*Id*.) She noted that the doctor's order to return the patient to a ventilator went ignored from 10:10 a.m. until 10:40 a.m. (*Id*.) The report also referenced the warnings from Pate to Anderson-Wilson about the patient's distressed condition. (*Id*.)

English recommended Anderson-Wilson's termination, and this recommendation was approved by Select's CEO. (*Id*.; Dyer Aff. [DE 41-6], ¶ 9). She was fired on October 31, 2006, for "Gross misconduct, failure to follow orders in a timely manner to place patient back on ventilator per doctor's order. Resulting in near code blue, compromising the patient's airway." (Anderson-Wilson Disciplinary Action Form [DE 41-4]). Metz received a written reprimand for failure to render service immediately to a patient in respiratory distress. (Metz Disciplinary Action Form [DE 41-4]).

Anderson-Wilson argues that Metz is a similarly situated Caucasian employee who was treated more favorably. She also holds up Tracy Morris, another Caucasian RT involved in a different T-piece patient incident, as a second similarly situated employee. On the day of Morris's patient incident, Morris had divided her ten assigned patients between herself and a

new RT she was mentoring, Tony Rush (Nimon Dep. [DE 59-5], at 18-21). A doctor in charge of one of those patients ordered her removed from a ventilator and placed on a T-piece for a period of two hours. (*Id.*) Instead, the patient remained on the T-piece for six hours. (Nimon Decl. [DE 59-6], ¶ 5.) The patient suffered respiratory distress and passed away. (*Id.*) After an investigation into the incident, Select determined that neither Morris nor Rush had engaged in any negligent or improper conduct and that the patient's death was unrelated to their actions. (*Id.*, ¶ 7).

## DISCUSSION

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See Howard v. Lear Corp. EEDS & Interiors*, 234 F.3d 1002, 1004 (7th Cir. 2000); *Mills v. Health Care Serv. Corp.*, 171 F.3d 450, 458 (7th Cir. 1999). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Pugh v. City of Attica, Ind.,* 259 F.3d 619, 625 (7th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When examining the evidence, the court should resolve all ambiguities and draw all inferences in favor of the non-moving party. *Haefling v. United Parcel Serv., Inc.,* 169 F.3d 494, 497 (7th Cir. 1999); *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir. 1994).

Title VII makes it an unlawful employment practice for an employer "to fail or refuse to hire or to discharge any individual, or to otherwise discriminate against any individual ... because of such individual's race . . ." 42 U.S.C. § 2000e-2(a)(1).[1] Proof of discrimination can

---

[1] Anderson-Wilson also brings a claim under 42 U.S.C. 1981. But since claims under Title VII and claims under 1981 are analyzed the same way, *see Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 982 (7th Cir.1999), I will only discuss the Title VII claim here.

be made under either a direct or indirect method. *See Jackson v. E.J. Brach Corp.,* 176 F.3d 971, 982 (7th Cir.1999). Anderson-Wilson pursues only the indirect method for this matter. In order to establish a *prima facie* case of intentional discrimination under the *McDonnell-Douglas* approach, Anderson-Wilson must demonstrate 1) she is a member of a protected class; 2) she was meeting her employer's legitimate expectations; 3) she experienced an adverse employment action; and 4) she was treated less favorably than one or more similarly situated employees outside of his protected class. *See Burks v. Wis. Dep't of Transp.,* 464 F.3d 744, 750-51 (7th Cir. 2006). If she establishes a *prima facie* case, a presumption of discrimination is raised, and the burden shifts to Select to proffer a legitimate, nondiscriminatory reason for its action. *Id*. If Select proffers a such a reason, the burden shifts back to Anderson-Wilson to produce evidence that demonstrates Select's proffered reason is either not credible or more likely than not pretextual. *Id*.

Select does not deny Anderson-Wilson has met the first and third prongs, though it takes issue with the second and fourth. The only event Select raises to show that Anderson-Wilson did not meet Select's legitimate expectations is her patient's October 13, 2006 incident. For her part, Anderson-Wilson offers satisfactory evaluations extending from May of 2003 through 2006. *See* Performance Reviews [DE 50-3]. "[W]here the issue is whether the plaintiff was singled out for discipline based on a prohibited factor, it 'makes little sense ... to discuss whether she was meeting her employer's reasonable expectations.' " *Curry v. Menard, Inc.,* 270 F.3d 473, 477 (7th Cir. 2001) (quoting *Flores v. Preferred Technical Group,* 182 F.3d 512, 515 (7th Cir.1999)). In other words, in cases like this where the plaintiff claims that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of *McDonnell Douglas* merge and the focus simply becomes whether the plaintiff can establish that similarly

5

situated employees were treated more favorably. *Grayson v. O'Neill,* 308 F.3d 808, 818 (7th Cir. 2002); *see also Peele v. Country Mut. Ins. Co.,* 288 F.3d 319, 329-30 7th Cir. 2002).

To satisfy the "merged" element, Anderson-Wilson must show that she was treated less favorably than a similarly-situated employee. *Grayson,* 308 F.3d at 818. A similarly-situated employee is someone who is directly comparable to Anderson-Wilson "in all material aspects." *Herron v. DaimlerChrysler, Co.,* 388 F.3d 293, 300 (7th Cir. 2004) (citing *Grayson,* 308 F.3d at 819) (internal quotation marks omitted). In conducting this analysis I must look at all relevant factors including whether the employee was similarly situated with respect to performance, qualifications, and conduct. *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 617 (7th Cir. 2000).

Significant differences exist between Anderson-Wilson and Metz. Most importantly, the distressed patient was formally assigned to Anderson-Wilson, while Metz was for all intents in purposes a short-term stand-in. Anderson-Wilson was familiar with the patient's history and specific needs, while Metz was not. Both left the room when the patient was in a vulnerable condition, but whereas Metz left with the patient's needs in mind – that is, to alert the attending RT (Anderson-Wilson) – Anderson-Wilson, by contrast, was literally "out to lunch." Metz at least recognized the patient was in trouble and was seeking to rectify it by finding the patient's assigned RT. Perhaps it would have been better for Metz to stay with the patient to apply emergency care, but his decision to leave was made with the goal of improving the patient's medical condition. Anderson-Wilson, on the other hand, placed the patient at risk because of personal pursuits. Metz faced his difficult choice precisely because of the fact that he was not the assigned RT and so was not familiar with the patient's medical history. He would never have been in that predicament if Anderson-Wilson had not abandoned her patient in the first place, or at minimum, fully apprised Metz of the patient's condition so that he would not feel the need to

leave if the patient worsened. So Anderson-Wilson's conduct was different from Metz's, making Metz an inappropriate comparator.

Anderson-Wilson also differs from Tracy Morris. Unlike Anderson-Wilson, Morris never placed a T-piece patient at risk by taking a break or otherwise leaving her patient's room for personal reasons. Although she was involved with a patient who also suffered from a T-piece incident, her involvement was only tangential. Another RT, Tony Rush, was directly responsible, as he and Morris had split up a set of ten patients in the beginning of the day between them. The patient in question was one of the five that Rush had drawn, and so Morris was not in charge of the patient's minute-to-minute care. Morris was merely serving as Rush's orientation "resource"; available to answer questions if they arose but not to monitor his patients for him. *See* Nimon Dep. [DE 59-5] at 34-35. Although Rush was new to the hospital, he had five years of experience as an RT. *See id*. [DE 59-5] at 34. There is nothing to suggest that Morris retained a duty to carefully monitor Rush's patient or that she was ultimately responsible for the patient's well-being in the same manner as Anderson-Wilson was for the patient she handed off to Metz. So Anderson-Wilson's attempts to compare herself to Morris are unavailing and she has not attempted to compare herself to Rush, presumably because Rush is also African-American. Nimon Decl. [DE 59-6] at 3.

Select has also presented a legitimate, non-discriminatory reason for terminating Anderson-Wilson; it judged her to be grossly negligent in abandoning her patient while on a T-piece trial and not implementing a doctor's order to place the patient back on a ventilator in a timely fashion. So the burden shifts back to Anderson-Wilson to show that the proffered reason is merely a pretext for discrimination. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507, 510 (1993); *Hossack v. Floor Covering Associates of Joliet, Inc.*, 492 F.3d 853, 860 (7th Cir. 2007).

7

A plaintiff can show pretext either "directly with evidence that [the employer] was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." *Sarsha v. Sears Roebuck & Co.,* 3 F.3d 1035, 1039 (7th Cir.1993). Where a plaintiff lacks direct evidence of pretext, she at least "must show that the employer's reason is not credible or that the reason is factually baseless." *Perez v. Illinois,* 488 F.3d 773, 777 (7th Cir.2007). This means that she must show that there is some deceit afoot. In other words, that Select is concocting a reason to get rid of Anderson-Wilson to mask its real motive of racial discrimination. *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 684 (7th Cir. 2000).

There is nothing to indicate that race was a factor in Anderson-Wilson's termination. The investigation and conclusion of gross negligence, performed by English and endorsed by Select, is credible. Select had solid footing to determine that Anderson-Wilson knew of her patient's troubled respiratory status, and as a result was grossly negligent for abandoning her post. Select relied on the oral statements and written notations of Pate, the patient's medical chart, the doctor's order which itself recognized growing troubles for the patient, and lastly, the undisputed fact that Anderson-Wilson was away on break when the patient was undergoing a risky T-piece trial and when he later began to code. Together, there are enough facts to form a reasonable, non-discriminatory basis for the decision to terminate.

Anderson-Wilson attacks the soundness of Select's reliance on these factors. For example, she disagrees with Pate's assertions that Anderson-Wilson was repeatedly warned about her patient's declining respiratory condition, despite the logs which say otherwise, and denies that Pate was in the room when some of the events transpired. She maintains that Pate's statements exhibited internal inconsistencies, but she does not explain what those inconsistencies might be. She also notes that both she and Metz testified that the patient was not in distress

8

prior to coding. But Select chose to credit Pate over Anderson-Wilson and Metz, not just because those two were the actual subjects of the investigation but because the medical charts and nurse's notes supported that conclusion. "The focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was accurate, wise, or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000). There is nothing inherently bogus or obviously dishonest about Select's course of action. Select's choice to characterize Anderson-Wilson's actions as gross negligence and terminate her for it may have been, at worst, an unwise decision, but the evidence does not indicate that there was anything dishonest about its reason for doing so. And there is certainly nothing to suggest a hidden discriminatory motive. As a consequence, Anderson-Wilson has failed to meet her burden of showing pretext.

It is also worth noting that the Select employees most influential on Select's decision to fire were African-Americans themselves. English was her supervisor who conducted the investigation and concluded that termination was appropriate, while Pate was her co-worker whose account was credited over Anderson-Wilson's. In addition, while Anderson-Wilson takes issue with Tracy Morris's lack of punishment in the other incident, the same leniency for the same incident was extended to Tony Rush, who is also African-American. While the fact that her supervisor and opposing co-workers were the same race as Anderson-Wilson does not "automatically refute" her claim, it does suggest that Select's analysis of the October 13th incident was "not merely a ruse" for her discharge. *Rush v. McDonald's Corp.*, 966 F.2d 1104, 1118 n. 50 (7th Cir. 1992). Added as a factor to the other circumstances calling for the rejection of Anderson-Wilson's pretext argument, the scales are more than tipped towards the conclusion that there was an absence of discriminatory motive. *See Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997)(finding it "highly unlikely" that a supervisor was discriminating on the basis of national origin when the plaintiff was of the same national origin); *Plair v. E.J.*

9

*Brach & Sons, Inc.*, 105 F.3d 343, 350 n.4 (7th Cir. 1997)(using as evidence against pretext the fact that plaintiff's supervisor was of the same race); *Parker v. Rockford Park Dist.*, 2001 WL 114405, * 4 (N.D. Ill. Feb. 2, 2001)(noting that plaintiff, plaintiff's supervisor and replacement were all of the same race and such circumstances weighed against a finding of racial animus).

## CONCLUSION

For the foregoing reasons, Select's Motion for Summary Judgment [DE 39] is **GRANTED**. Select's Motion To Strike [60] is **DISMISSED AS MOOT**. The clerk is directed to terminate this matter.

**SO ORDERED**.

ENTERED: February 3, 2009

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT
